**STATE of Missouri ex rel. STATE HIGH-
WAY COMMISSION, Respondent,**

v.

**NICKERSON AND NICKERSON, INC., et al.
(Exceptions of Alvia L. Rice and
Mary Rice), Appellants.**

**No. 56558.**

Supreme Court of Missouri,
Division No. 2.

May 14, 1973.

Robert L. Hyder, Earl H. Schrader, Jr., Minor C. Livesay, Frank O. Benson, Kansas City, for respondent.

Thomas A. Sweeny Kansas City, for appellants; Popham, Popham, Conway, Sweeny & Fremont, Kansas City, of counsel.

HOUSER, Commissioner.

Trial of exceptions by Alvia L. Rice and Mary Rice to commissioners' award in a condemnation action filed by State Highway Commission resulted in a jury verdict of $75,000. Commission evidence showed damage to landowners of $24,700. The difference, $50,300, is in controversy on landowners' appeal from an order sustaining Commission's motion for new trial. This Court has jurisdiction, the notice of appeal having been filed prior to January 1, 1972. Mo.Const. Art. V, §§ 3, 31, V.A. M.S.

The date of the taking was April 1, 1964. Appellants owned 54 acres of land in Jackson County, located on 71 Bypass some 600 feet south of the right of way of Interstate Route 70 and one fourth mile north of U.S. Route 40. The right of way for I-70 had been acquired more than four years before April 1, 1964, but I-70 had not been constructed to the intersection of I-70 right of way and existing 71 Bypass on that date. Prior to the date of taking I-70 had been completed and opened for public travel from the Kansas state line easterly only as far as Blue Ridge Boulevard in Kansas City. It was not until October 30, 1964 (some seven months after the date of the taking) that I-70 from Blue Ridge Boulevard to 71 Bypass in Jackson County was opened for public travel. On August 20, 1965 I-70 was completed and opened for public travel from 71 Bypass east to Grain Valley.

I-70 runs generally east and west. 71 Bypass ran north and south. Appellants' 54-acre tract lay east of and for 650 feet abutted 71 Bypass. The land was zoned "Commercial District" for a depth of 500 feet to the east and, with the exception of 4 acres, the rest of the 54 acres was zoned "Single Family Residential District."

By written stipulation of the parties filed in the case before trial it was agreed that "Prior to April 1, 1964 Interstate 70 was designed to intersect with 71 Bypass by means of a diamond interchange." The interchange was originally designed and approved by Commission as a diamond interchange on November 12, 1959.

If a diamond-shaped interchange had been built as originally designed and planned, and if 71 Bypass had remained as it existed prior to April 1, 1964, with unrestricted right of ingress and egress onto 71 Bypass from and to the 650 feet of appellants' property abutting 71 Bypass, appellants' land would have been accessible to and from I-70, and none of appellants' land would have been required for the purpose of constructing the interchange. The diamond interchange, however, was never built; 71 Bypass was relegated to the status of a dead-end road, and an entirely new north-south highway called I-470 was designed and built. These changes were made because it became evident that traffic along 71 Bypass was going to increase. Therefore, instead of building the diamond interchange at the intersection, as originally planned, the Commission changed its plans and redesigned the project by providing for a larger and more extensive interchange in the form of a cloverleaf, and designed a 2-lane north-south highway, to be located east of then-existing 71 Bypass. These changes in the plans required the present taking of 12.581 acres for right of way for I-470 and 1.602 acres for a drainage easement, all from the west side of the 54-acre tract, leaving .643 acres on the west side of I-470 and 40.821 acres on the east side of I-470. As a result the 40.821 acres became and is completely landlocked. These new plans were approved by the Commission on November 16, 1963, shortly before the filing of this condemnation action on January 7, 1964. Interstate 470

and the clover-leaf interchange were later built according to these new plans.

■ The trial court sustained Commission's motion for new trial on the basis, inter alia, of a supposed mutual mistake of fact which the trial court considered resulted in the admission of improper and misleading evidence, namely, the evidence relating to the diamond interchange. The court concluded that the verdict was "excessive and against the greater weight of the credible evidence because it was based upon testimony of expert witnesses which was in turn erroneously based upon a prior knowledge of a proposed public improvement which was in fact abandoned before the admitted date of taking." [Commission argues that in granting the new trial because the verdict was excessive the court was properly exercising a sound judicial discretion and that, no abuse of discretion having been alleged or shown, no error was committed. The instant situation, unlike that found in cases cited by Commission, is one in which the court has specified the particular reason it considered the verdict excessive, namely, erroneous admission of certain evidence. This raises a legal question—an issue of law—and not a question of fact, and takes the case out of the field of discretionary action. "The trial court's power 'to grant a new trial is discretionary only as to questions of fact and matters affecting the determination of issues of fact. There is no discretion in the law of a case, nor can there be an exercise of sound discretion as to the law of a case.' Cooper v. 804 Grand Bldg. Corp., supra, 257 S.W.2d [649] 655[7] [Mo.]." McCormack v. St. Louis Public Service Co., 337 S.W.2d 918, 921[2] (Mo.1960).]

In its motion for new trial and on this appeal Commission takes the position that under Rule 78.01 (allowing a new trial for mistake of a party or his attorney or mistake committed by a witness) a new trial was properly granted because there was a mutual mistake of fact in that the attorneys for both parties erroneously adopted Plaintiff's Exhibit 1 (a large scale drawing showing the I–70 diamond interchange as originally designed in its relation to the 54-acre tract, 71 Bypass and U. S. Route 40) as representing the condition of the property and new highway before the taking; that the witnesses, court and jury were thereby led into the same mistake. The argument is that as a consequence improper and misleading evidence of values was admitted, resulting in an excessive verdict; that the expert witnesses were permitted to base their opinions of the before value upon the mistaken belief that a diamond interchange would have been constructed prior to the date of taking when in truth and fact such a plan had been abandoned prior to the date of taking, and the diamond interchange was nonexistent.

■ The court did not err in admitting the evidence of which Commission now complains. A reading of the whole record indicates clearly and we find as a fact that both Commission and landowners tried this case upon the basis of and understanding (1) that the before situation was one in which the 54-acre tract abutted on 71 Bypass which Commission engineers originally planned would intersect I–70 by means of a diamond interchange, which combination of existing north-south highway and diamond interchange would not require the taking of any of the 54-acre tract; (2) that the condemnation was necessitated by a change of plans by Commission and the redesign of the north-south highway and interchange, which new combination of north-south highway and clover-leaf interchange would take the land in question and landlock the remainder of the tract. It is plain from this record that there was no mistake of fact; that neither the parties, their counsel, the judge, jury nor witnesses were laboring under the misapprehension that the diamond interchange was "in place at I–70," or "was already in place according to the plans," or that Plaintiff's Exhibit 1 represented the conditions as to the property and the presence of a diamond interchange as they actually

existed before the taking. It was iterated and reiterated during the trial and made clear that the diamond interchange was never built; that it never existed in fact; that Plaintiff's Exhibit 1 showing the diamond interchange was the original plan or design, but that the plans were changed and the interchange redesigned and built in clover-leaf form. Both parties joined in representing to the court and jury that the diamond interchange as originally proposed represented the before situation. In so doing they acted properly, because in truth and fact that was the situation existing up to the time the Commission planned I–470 and redesigned the interchange. Commission claims the right to abandon plans, and that this was an abandonment; that the plan in effect on the day of the appropriation is the only proper plan for consideration, and that reference to the latter plan is to be made only for the purpose of showing the after condition. There is no question that Commission may abandon plans without incurring liability to landowners along the abandoned route, Hamer v. State Highway Commission, 304 S.W.2d 869, 872 (Mo.1957), but this was not an abandonment in the technical sense Commission suggests. It was simply a change or alteration of plans, resulting in the taking of part of appellants' land and rendering the remainder useless, whereas completion of the original plan would not have taken any of their property, but would have left the 54 acres untouched and appellants in a position to enjoy the benefit of a considerable rise in land values. Commission's argument on abandonment would have validity if the plan to build *I–70* had been abandoned in the technical sense, but has no validity as applied to the change of the character and type of north-south roadway and interchange.

That no one was misled or deluded into thinking that the diamond interchange was actually constructed and in place before the appropriation is conclusively demonstrated by the record. As stated above the parties stipulated that "Prior to April 1, 1964 Interstate 70 was designed to intersect with 71 Bypass by means of a diamond interchange." In his opening statement counsel for landowners, referring to Plaintiff's Exhibit 1, informed the jury that on April 1, 1964 I–70 had not been completed; that "This is the way it was on the drawing board. The land for I–70 had all been condemned and it was already owned by the State; and this was the original design, a diamond type interchange between 71 Bypass and I–70. * * * The State then came along April 1, 1964, and said we want it [the land in question] for 470, so the result was what you see over here on Plaintiff's Exhibit 2.[1] Instead of building I–70 and leaving Mr. Rice with a very valuable tract of land about 600 feet or less from this interchange, they put the ramp and the cloverleaf to intersect 470 and I–70." In his opening statement counsel for Commission told the jury, "Now what happened, and the reason this lawsuit is so difficult from a factual standpoint is *you've got to assume this interchange was in place. It was never built,* because it became evident the traffic here was going to increase and that it would be necessary to make Interstate 470. Now, this is the way it actually looks today. [Evidently pointing to the plan showing the cloverleaf which was actually built.] * * * [T]o build Interstate 470 the engineers decided to leave the old right of way there, 71 Bypass, and make it dead-end right there at the creek * * *." (Our emphasis.) Later Commission counsel referred in his opening statement to the "proposed" diamond interchange. While cross-examining witness Choplin Commission counsel asked whether the witness would agree that "had this interchange been built in the diamond configuration which is shown here on the Plaintiff's Exhibit 1" the owners of the

---

1. Exhibit 2 is a large scale drawing showing Interstate 70 and the clover-leaf interchange as actually built; U.S. Route 40; Interstate 470; the 54-acre tract as it was cut in two, and the acreage appropriated by this condemnation.

**348**

quadrants closest to the interchange "probably would have been approached first for commercialization * * *," thus again clearly indicating that the diamond interchange had only been proposed and not actually built. Commission and Commission counsel consented to and joined in the introduction in evidence of these exhibits, which showed the very thing the Commission now claims was mistakenly shown in evidence. These exhibits were prepared by the representatives of the Commission. They were exhibited to the jury by agreement of the parties from the beginning of the trial. They were received in evidence by agreement of the parties and used by both parties throughout the trial without objection. On direct examination Commission's expert and only witness testified that while the right of way for I–70 had been acquired as of April 1, 1964 the highway had not actually been built yet and "that 71 Bypass was originally planned to intersect with I–70 by means of the diamond interchange which is shown on Plaintiff's Exhibit 1"; that Rice had a frontage of about 650 feet along the east side of 71 Bypass; that Plaintiff's Exhibit 2 was the way the highway was actually built "as a result of the condemnation in this case that we are trying here today," and that land at the diamond interchanges on I–70 had greatly increased in value in the years 1960–1964 before the roadway was ever built.

Appellant landowners cite cases [2] for the proposition that parties to litigation who voluntarily enter into a stipulation as to the facts, and try their case on the basis of facts which they do not wish to controvert, are bound and concluded by their agreement and will not be heard on appeal to dispute what they have agreed upon. In those cases there was an effort on appeal to advance facts contrary to those stipulated at the trial. On this appeal Commission is not even disputing facts agreed upon at the trial; Commission on this appeal is advancing facts which are *the same as* those stipulated at the trial. No one claimed at the trial that the diamond interchange was actually built. On the contrary, judge and jury were told that it was a proposed plan, changed and altered to fit conditions which had changed since the original design was drawn.

This is not a case of mistake of fact or surprise, as contended by Commission. Both Commission and its counsel were fully advised as to the facts; indeed, the Commission itself created the factual situation. No action taken by Commission or its counsel was based upon, and no representation made by them, constituted, a mistake as to the facts. Nor were landowners' counsel mistaken or taken by surprise. They knew, acknowledged, tried the case on the basis of, and never denied, what had taken place.

This case presents this situation: Commission voluntarily and knowingly joined with landowners in presenting the case to the jury on the basis that the before situation was a piece of land abutting on a highway that led into an intersection with an interstate highway being built according to plans prepared by Commission engineers, whch provided for the installation of a diamond interchange at the intersection. Having suffered a damage verdict greater than Commission counsel believe landowners deserve, and viewing their trial strategy in retrospect, counsel for Commission claim in effect on appeal that a false issue was tried. Commission wants a second bite at the apple—a new trial in which they will abandon their previous strategy and seek to exclude their Exhibit 1 and all evidence pertaining to the original design

2. Milton Const. & Supply Co. v. Metropolitan St. Louis Sewer District, 352 S. W.2d 685 (Mo.1961); Sears, Roebuck and Co. v. Hupert, 352 S.W.2d 382 (Mo. App.1961).

of the interchange. That evidence, however, is admissible and to allow a second trial on the new theory would permit the case to be tried on a false issue. Commission counsel tried the case on the right theory—the true issue was tried—and counsel will not be permitted to retry the case on an improper theory. The circuit court erred in sustaining Commission's motion for new trial on the grounds discussed.

Further error was committed in sustaining the motion for new trial on the ground that the court erred in giving Instruction No. 4 on damages. No. 4 is word for word the instruction set out in MAI 3.-02 for use in such a situation. It would have been error to give any other instruction. Furthermore, the record shows that No. 4 was *offered by Commission.* Commission cannot complain about an instruction given on its behalf and at its request. Brown v. Bryan, 419 S.W.2d 62, 67 (Mo. 1967); Grundmann v. Knezevich, 449 S. W.2d 874, 876 (Mo.App.1970).

Accordingly, the order sustaining the motion for new trial is reversed and the cause is remanded with directions to reinstate the verdict and judgment for appellants.

STOCKARD, C., concurs.

PER CURIAM:

The foregoing opinion by HOUSER, C., is adopted as the opinion of the Court.

MORGAN, P. J., DONNELLY, J., and FINCH, C. J., concur.

HENLEY, J., not sitting.