**MALAN CONSTRUCTION COMPANY, Appellant,**

v.

**STATE HIGHWAY COMMISSION of Missouri, Respondent.**

**No. WD31744.**

Missouri Court of Appeals, Western District.

Sept. 1, 1981.

---

Tom J. Helms, Kansas City, for appellant.

Bruce A. Ring, Chief Counsel, John W. Maupin, Asst. Chief Counsel, Jefferson City, for respondent.

Before KENNEDY, P. J., and SHAN-GLER and WASSERSTROM, JJ.

WASSERSTROM, Judge.

Malan Construction Company brought this suit to recover money paid by it to the State Highway Commission for special access to Route 45 from its property. The trial court denied recovery and Malan appeals. We affirm.

The portion of Route 45 in question was originally a segment of old Highway 71. As originally constructed, Highway 71 was a two lane highway running in a generally north and south direction in Platte County. In the early 1950s it was decided to improve the facility to a four lane divided highway with restricted access.

In connection with that improvement, the original two lanes were retained on the west for southbound traffic. The Commission acquired additional land to the east to provide northbound lanes. The access rights of owners of land adjoining on the west of the old original highway were purchased by the Commission. As part of that purchase program, Mr. and Mrs. Charles Witter, Malan's predecessor in title, conveyed their access rights under a deed dated April 7, 1952, which provided in part that the Witters for themselves and their successors "reserve the usual rights of direct access between their property * * * and any adjacent outer-roadway which may be maintained by a governmental agency on the State Highway now designated Route US 71, and along such outer-roadway to the thruway...."

Later Congress enacted the National Defense and Interstate Highway Act of 1956, and in 1959 the Commission adopted and filed plans to incorporate this portion of Highway 71 into the interstate system as a part of I–29, the construction of which was then being projected. Under the 1959 plan, the eastern two (northbound) lanes of High-

way 71 were to become the two west (southbound) lanes of I–29. The Commission proposed to acquire land still further east for the purpose of constructing new northbound lanes. The existing two westernmost lanes of old Highway 71 were to become an outer-roadway, and these two lanes were so marked and designated on the plans filed by the Commission.

In 1967 the Commission further reviewed and amended the plans for this segment of the proposed I–29, which was still on that date only in the stage of contemplation. Under the 1967 revision, the existing westernmost lanes of Highway 71 were no longer designated as an "outer-roadway," but these lanes instead were designated to become part of Route 45. Route 45 had been a highway running in an east and west direction and intersecting old Highway 71. The point of intersection is sometimes referred to in the record, and for purpose of simplicity will be referred to in this opinion, as 64th Street. Under the plan proposed for the new I–29, there would be no interchange provided at 64th Street. The Commission's 1967 plan provided that at that point, Route 45 would split to the north and south by use of the westernmost lanes of old 71. The northern extension so formed would go to Linden Road, at which point there would be a full interchange allowing for access to and from I–29. The southern section would go south to the Houston Lake interchange where there would be access at that point to and from I–29.

It was not until two years later, in 1969, that I–29 was completed and opened for traffic. It was then for the first time that the segment of old Highway 71 now in question became actually used as a part of Route 45 in accordance with the 1967 revision.

In October of 1973, the Commission let a contract for a half-diamond interchange at 64th Street. These new ramps permitted access for traffic going south on I–29 from Route 45 and for northbound traffic leaving I–29 in order to travel west on Route 45. As soon as those ramps were completed, there was no longer a need for any portion of Route 45 to extend southward to the Houston Lake interchange. Accordingly the Commission redesignated that southern extension as an outer-roadway. However, the northern extension going to Linden Road still retained the designation as a portion of Route 45. The Commission's plan was that when funds became available, the half-diamond interchange would be completed to a full diamond; and when that was accomplished, then the northern extension of Route 45 would also be redesignated as an outer-roadway.

In November 1973, Malan's lessor applied to the Commission for two new entrances onto the northern extension of Route 45 so as to permit traffic to and from a new K–Mart store and adjoining food market. That application was denied, but the Commission directed that a traffic study be made and that reconsideration of the request be made following the study. In May 1974, the Commission approved the construction of one of the two commercial entrances requested by Malan, subject however to payment by Malan to the Commission. The amount of that payment was later set at $52,315, which Malan did pay and in exchange for which the Commission gave Malan a quit claim deed.

Malan has always contended that it was entitled to access to this roadway as a matter of right and should not have been required to pay anything to the Commission in order to be able to construct its new commercial entrance. It filed this suit in an attempt to vindicate that contention and to recover the $52,315 which it says was wrongfully coerced.

In support of its contention, Malan advances two theories. Its first theory argues that it had an inchoate easement of access to the roadway which was to mature whenever the Commission began to maintain this strip of highway as an "outer-roadway;" that Malan's right to the easement vested in 1959 when the Commission filed its plans designating the highway segment in question as an "outer-roadway;" and that Malan could not be deprived of that vested easement right without compensation. Malan's

second theory argues that the stretch of highway here in question is in reality an "outer-roadway," no matter what it is called by the Commission, and that Malan therefore had a free right of access thereto under the reservation contained in the 1952 deed from Witters to the Commission.

## I.

Central to Malan's first theory is its concept that the Commission's designation of the strip in question as an outer-roadway became irrevocable upon the filing of the Commission's plans with the County Clerk in 1959. Malan admits that the Commission was free to plan, replan, modify and revise its plans in its own free discretion during all stages preliminary to such filing. It further admits (as it must under many court rulings exemplified by *Hamer v. State Highway Commission*, 304 S.W.2d 869 [Mo. 1957]), that even after such filing the Commission was free to abandon the plan without any liability to adjoining landowners. However, Malan insists that there is a difference between wholly abandoning the plans and merely changing the plans; and it claims that while the Commission might do the former, it could not do the latter.

Malan's reliance for this contention rests solely upon *State ex rel. State Highway Commission v. Nickerson & Nickerson, Inc.*, 494 S.W.2d 344 (Mo.1973). In that case the condemnee owned land near the intersection of I–70 and 71 Bypass. The Commission originally planned a diamond shaped intersection which would have left intact the condemnee's 54 acres adjoining 71 Bypass. Then the Commission amended its plan so as to provide for the construction of a new highway I–470 and a cloverleaf intersection which would take part of the condemnee's acreage and would leave it .643 acres west of I–470 and 40.821 landlocked acres on the east side. The condemnation case went to trial for determination of damages to the condemnee, and that issue was tried on the assumption by both parties that the "before" condition of condemnee's land was represented by the Commission's original plan with the proposed diamond shaped intersection, and that the "after" condition was the final cloverleaf configuration.

After a large award by the jury to the condemnee, the Commission sought and was granted a new trial on the ground that the aforesaid assumption as to the before and after conditions was a mutual mistake of fact. To support its position, the Commission argued that it had a right to abandon the plan of a diamond shaped intersection and that reference thereto as the "before" condition was therefore necessarily error. The Supreme Court rejected that contention and reversed the grant of a new trial. In reaching that result, the Supreme Court stated that the Commission had a right to abandon the diamond shaped intersection, but that the case did not represent an abandonment in the technical sense, but rather "[i]t was simply a change or alteration of plans, resulting in the taking of part of appellants' land and rendering the remainder useless, whereas completion of the original plan would not have taken any of their property . . . ."

*Nickerson* presented a problem entirely different from that presented in the present case. The language above quoted was stated in a different context which is wholly irrelevant to the problem in the case at hand.

■ Rather than being governed by *Nickerson*, the present case is governed by the principle that the Commission has a broad right to control the improvement and locations of highways. This right of control extends to the alteration of plans as well as the abandonment of plans. This scope of authority is well stated in *Hamer, supra,* where the Supreme Court emphasized that the Commission must "have the right to *alter* or abandon a proposed location of a highway without incurring liability to landowners along the abandoned route." (Emphasis added.) As a matter of fact, the terms of Section 227.050, RSMo 1978, which contains the provision requiring the Commission to file plans with the County Clerk also itself recognizes the right of the Commission to modify those plans even after filing. Thus that section states that the

Commission's chief engineer shall submit highway plans to the Commission and furnish a copy to the County Clerk; and the Commission is then to approve the plans, which shall be the act of the department "and shall not be modified or disturbed *except by subsequent action of the commission.*" (Emphasis added.)

The artificiality of Malan's theory presently under consideration is demonstrated by the fact that no physical change occurred to the highway segment now in question at the time of the filing of the plans in 1959. This segment of highway continued just as before and still so continued in 1967 when the plan modification of which Malan complains was adopted by the Commission. Malan itself makes no claim that it or its predecessors in title could have constructed an entrance onto that highway segment in either 1959 or 1967. Its contention is limited to the claim that the right to construct an entrance matured in 1969 when I–29 was completed and opened to traffic.

The decisive date for consideration therefore is 1969, not 1959. The decisive event was not the filing of the original plans, but rather the opening of I–29 with the accompanying change in use of the highway strip in front of the Malan property. The real question to be decided is therefore: What was the real nature of the new use to which this old segment of highway was put for the first time in 1969? This brings us to a discussion of Malan's second theory, discussed below in Section II of this opinion.

## II.

■ Of Malan's two theories, the more serious one is the second which argues that after 1969 the use of the highway segment in front of its property was that of an outer-roadway and that therefore Malan should have been afforded free access thereto under the reservation contained in the 1952 deed. This claim was the theory upon which this case was primarily tried in the circuit court. As stated by Malan's counsel there: "[I]t is the contention of plaintiffs in this matter that that Route 45,

as it is designated by the Highway Commission, is really an outer roadway in disguise, if I may use the vernacular, and that the plaintiffs contend that it is an outer roadway functionally as far as the interstate system is concerned. . . ." Or, as Malan's counsel put it to the principal witness in the case, Dill: "In other words, if the Highway Commission wants to call it an outer roadway, then, there is access, but if the Highway Commission chooses to call it Route 45, or some other appropriate name other than an outer roadway, then there would not be access. * * * [T]hat is really the crux of this hearing and of this lawsuit; is it not?"

Malan endeavors to establish the meaning of the term "outer-roadway" as a matter of law, by defining it as an access road which is located on the principal right-of-way. For this definition, Malan cites Judge Finch's dissenting opinion in *State v. Brockfeld*, 388 S.W.2d 862 (Mo.banc 1965). Aside from the fact that Malan's reliance is upon a dissenting rather than a prevailing opinion, the opinion cited does not touch the issue here. Judge Finch's opinion sought to develop the distinction between an "outer-roadway" and a "service road." It did not consider in any way the difference between an outer-roadway and a designated highway, which is the question for present consideration.

No authority has been cited or found which undertakes to decide as a matter of law what constitutes maintenance of an outer-roadway. That leaves as the only other approach a determination as a factual matter whether the highway strip in question actually became an "outer-roadway" in 1969, and whether the action of the Commission in labeling it otherwise was capricious and unreasonable. The only direct evidence on that question was the testimony of Wilben H. Dill, the assistant to the Commission's Chief Engineer for Operations. Dill testified that the distinction between an outer-roadway as compared to a regular highway lies in the nature of the traffic and that the traffic on this segment was such as to qualify it as highway rather than as outer-roadway. He testified in this respect:

"Q. * * * [I]s there any different quality of traffic, any different type of traffic experienced on that road than there would be if it were marked an outer roadway?

A. Yes, sir; I think there is a different type of traffic on the road. It carries a lot of through traffic, people who are strange to the area, they don't know the area; if it was strictly an outer roadway, it would be more of a localized type traffic, people who know the area. So I think we can say the traffic on the road is substantially different by virtue of the 45 marking."

He also testified that there was a difference in the type of maintenance because of the Route 45 designation:

"Q. * * * [I]s there a difference in maintenance accorded to an outer roadway as opposed to the maintenance accorded to or afforded to a portion of a primary State highway system?

A. There is a difference by virtue of the difference in volume of traffic. As Route 45 the road would carry more traffic and would require more attention.

* * * * * *

Q. And has this portion of roadway ever been maintained as an outer roadway?

A. No, sir."

With respect to this matter the trial court made the following finding No. 18:

"Whereas an 'outer roadway' would be anticipated to serve only local traffic familiar with the roadway's characteristics, a state highway would be anticipated to serve travelers from outside the locality."

It further made the following conclusion No. 4:

"The relevant portion of roadway has never been maintained by a governmental agency as an outer roadway so as to entitle Malan to the 'usual right of direct access' reserved in the deed from Charles M. Witter and wife to the Commission dated April 7, 1952."

That finding and conclusion was fully supported by Dill's testimony and the other facts before the court. The trial court's determination therefore must be accepted under the standards of review set forth in *Murphy v. Carron*, 536 S.W.2d 30 (Mo.banc 1976).

Affirmed.

All concur.