STATE of Missouri ex rel. CHAN SIEW LAI, Relator,

v.

Honorable Jack A. POWELL, Judge, Respondent.

No. 59269.

Supreme Court of Missouri, En Banc.

April 14, 1976.

Rehearing Denied May 5, 1976.

Lincoln J. Knauer, Jr., Farrington, Curtis, Strong, Knauer & Hart, Springfield, for relator.

Wayne C. Smith, Jr., and Nicholas R. Fiorella, Springfield, for respondent.

HENLEY, Judge.

This is an original proceeding in which relator seeks to prohibit respondent from maintaining a temporary injunction enjoining a bank from paying its cashier's check held by relator.

The injunction suit out of which this proceeding arose was filed April 22, 1975, in the circuit court of Greene county by Nathaniel Gunn, doing business as Cameo-Nixa (hereinafter Gunn) against the Empire Bank of Springfield (hereinafter the Bank). The allegations of the petition are, in substance, that Kin Tak Hong, also

known as Chao Kin Tak (hereinafter Kin Tak), a broker of Hong Kong, represented to Gunn that he (Kin Tak) had a contract with others (unidentified in the record) whereby they agreed to purchase 60,000 metric tons of UREA, a fertilizer, and pay therefor $400.00 per metric ton, for delivery at an Indonesian port within one year; that relying upon these representations, he (Gunn) entered into a contract with Kin Tak in December, 1974, in which he agreed to sell and deliver, upon receipt and acceptance of a valid commercial letter of credit, and Kin Tak agreed to buy upon the above-stated terms and conditions not less than 60,000 metric tons of UREA. In connection with this agreement, Gunn and Kin Tak also entered into a supplemental contract in which it was agreed that Gunn would pay to Kin Tak certain "partial payments to be credited to the total amount [of commissions] to be earned by * * * Kin Tak" as broker. The petition further alleges (1) that 10,000 metric tons of UREA was thereafter sold, paid for and delivered in accordance with the contract and on April 17, 1975, pursuant to the supplemental contract, Gunn purchased from the Bank and it issued its cashier's check for $150,000.00 payable to the order of Kin Tak, the latter having represented to him that the balance of the 60,000 tons of UREA would be purchased and paid for as provided in the contract; (2) that at the time of this representation Kin Tak knew, and had known since March 1975, that the contract of purchase had been cancelled by his customers and that he would not perform the balance of his contract with Gunn; (3) that after Gunn learned that the contract for purchase of UREA had been cancelled by Kin Tak's customers he (Gunn) notified the Bank to stop payment on the check which, in the meantime, had been delivered to its payee by Gunn; (4) that by reason of the cancellation of the contract and this fraud practiced upon him by Kin Tak, he (Gunn) will suffer great loss and irreparable damages unless the Bank is enjoined from paying the cashier's check; (5) that Gunn has no adequate remedy at law, because "all potential defendants are nonresidents of [this country] and [because of] the tremendous expense, delay and difficulty in the institution of [suits in] courts wherein the laws may not be the law under which these parties contracted". In its answer, the Bank admitted issuance of the cashier's check for $150,000.00 payable to the order of Kin Tak, stated it had no knowledge regarding other allegations of the petition, and asked the court to make such order as the law required.

Shortly after respondent had issued a temporary injunction, the relator herein, Chan Siew Lai, intervened in the injunction suit and filed pleadings (a motion to dismiss and a petition) claiming, inter alia: (1) that he is the holder of the check and entitled to receive payment of the amount thereof; (2) that Gunn is without standing to sue to enjoin payment because not a party to the contract (evidenced by the check) between the Bank and the payee or the latter's assignee; (3) that the court is without jurisdiction to enjoin payment by the Bank under § 400.4–303, RSMo 1969;[1] (4) that the petition fails to state facts showing loss or irreparable injury would be suffered by Gunn if payment is not enjoined, or to show that Gunn is without an adequate remedy at law; (5) that the petition should be dismissed and the temporary injunction dissolved.

There was no response by Gunn or the Bank to these allegations of intervenor-relator's petition.

After presentation by intervenor (relator here) of his motion to dismiss the petition and dissolve the injunction, respondent announced that he would maintain the temporary injunction unless prohibited from doing so. Thereafter, relator sought and this court issued its provisional rule in prohibition. We now determine that the provisional rule should be made absolute.

---

1. References to sections of the statutes will be to this revision unless otherwise indicated. Section 400.4–303 is a part of the Uniform Commercial Code, Laws of Missouri, 1963, pp. 510–638.

Relator relies primarily on § 400.4–303, contending that under that section of the Uniform Commercial Code and in light of allegations that the fraud practiced was not upon the Bank but upon Gunn, respondent is without authority to terminate or suspend by injunction the Bank's duty to pay its cashier's check, and that in maintaining the injunction respondent is acting in excess of his jurisdiction. That section of the Code provides, in pertinent part, as follows:

"Any * * * stop-order received by [or] legal process served upon * * * a payor bank, whether or not effective under other rules of law to terminate [or] suspend * * * the bank's * * * duty to pay an item * * * comes too late to so terminate [or] suspend * * * such * * * duty if the * * * stop-order or legal process is received or served * * * after the bank has done any of the following:

(a) accepted or certified the item; * *."

"Accepted," as used in § 400.4–303(1)(a) means "acceptance" as that word is defined in § 400.3–410(1): "Acceptance is the drawee's signed engagement to honor the draft as presented."

■ A cashier's check, unlike an ordinary check,[2] is a check drawn by a bank on itself and is accepted by the mere act of its issuance. *First National Bank of Kansas City v. Produce Exchange Bank of Kansas City*, 338 Mo. 91, 89 S.W.2d 33, 39 (1935); 5B Michie, Banks and Banking (permanent edition), § 251; *State of Pennsylvania v. Curtiss National Bank, etc., et al.*, 427 F.2d 395, 398–399 [1–3] (5th Cir. 1970). It is sometimes, as here, purchased by a party from a bank for issuance payable to the order of another as payee. Thus, when issued, it becomes the primary obligation of the bank (rather than the purchaser) to pay it from its own assets upon demand, and the purchaser has no authority to countermand a cashier's check because of fraud allegedly practiced on the purchaser by the

payee. Sections 400.3–413(1), 400.3–410(1), and 400.4–303(1)(a); *State of Pennsylvania v. Curtiss National Bank, etc., et al.,* supra, at 398–399; *Meador v. Ranchmart State Bank*, 213 Kan. 372, 517 P.2d 123, 127–128 (1973).

■ The nature and usage of cashier's checks in the commercial world is such that public policy does not favor a rule that would permit stopping payment of them. It is aptly stated in *National Newark & Essex Bank v. Giordano*, 111 N.J.Super. 347, 268 A.2d 327 (1970): "A cashier's check circulates in the commercial world as the equivalent of cash. * * * People accept a cashier's check as a substitute for cash because the bank stands behind it, rather than an individual. In effect, the bank becomes a guarantor of the value of the check and pledges its resources to the payment of the amount represented upon presentation. To allow the bank to stop payment on such an instrument would be inconsistent with the representation it makes in issuing the check. Such a rule would undermine the public confidence in the bank and its checks and thereby deprive the cashier's check of the essential incident which makes it useful. People would no longer be willing to accept it as a substitute for cash if they could not be sure that there would be no difficulty in converting it into cash."

■ The stop order given by Gunn and the legal process issued in connection with the injunction suit were received by and served upon the Bank after it had issued the cashier's check and came too late to terminate or suspend the Bank's obligation to honor and pay it. Furthermore, the fraud allegedly practiced on Gunn by Kin Tak, if true, afforded him no standing or authority to countermand the Bank's obligation to pay its check on demand; his remedy is by action against Kin Tak.

■ Gunn's petition alleges facts which show not only that he has no claim for injunctive relief against the Bank, but also

---

**2.** An order by one party (drawer) directing a bank (drawee) to pay on demand a fixed sum

of money to a third party (payee). Section 400.3–104.

that none can be stated by amendment. Hence, in maintaining the temporary injunction respondent would be acting in excess of his jurisdiction, for which prohibition will lie. *State ex rel. Stifel, Nicolaus & Co. v. Clymer et al., Judges,* 522 S.W.2d 793, 798[3] (Mo. Banc 1975), and cases there cited.

The provisional rule is made absolute.

SEILER, C. J., and MORGAN, HOLMAN, BARDGETT and FINCH, JJ., concur.

DONNELLY, J., dissents in separate dissenting opinion filed.

DONNELLY, Judge (dissenting).

In Missouri, the right of appeal is given by statute. Section 512.020, RSMo 1969. Historically, this statute has been construed as directing generally that appeals may be taken only from *final* orders or judgments.

In *State ex rel. Smith v. Greene,* 494 S.W.2d 55 (Mo. banc 1973), this Court effectually repealed § 512.020, supra, and held that the writ of prohibition may be utilized as a device for taking an appeal from an *interlocutory* order or judgment.

I must recognize, therefore, that the principal opinion is following precedent when it intrudes into the judicial process at the trial level. However, I note that as recently as March 8, 1976, in *State ex rel. McCurley v. Hanna,* 535 S.W.2d 107 (Mo. banc 1976), this Court cited *State ex rel. Schaper v. Stussie,* 487 S.W.2d 49, 51 (Mo.App.1972) for the proposition: "Prohibition is no substitute for appeal nor is it a device to correct trial errors or rulings." I would submit that, in the present state of affairs, pronouncements such as these are confusing. They perpetuate myths.

I respectfully dissent.