**FIDELITY & DEPOSIT COMPANY OF MARYLAND,**
**Appellant/Cross–Respondent,**

**v.**

**Alfred J. FLEISCHER, Sr., Alfred J. Fleischer, Jr., and Eva L. Fleischer, Individually and d/b/a Fleischer–Seeger Construction Company, Respondent/Cross–Appellant.**

**No. 54405.**

Missouri Court of Appeals,
Eastern District,
Division Two.

May 9, 1989.

Motion for Rehearing and/or Transfer to Supreme Court Denied June 7, 1989.

Application to Transfer Denied
Aug. 1, 1989.

David M. Duree, St. Louis, Kenneth I. Jonson, Washington, D.C., for appellant/cross-respondent.

Merle L. Silverstein, Clayton, Edward L. Foote, Chicago, Ill., for respondent/cross-appellant.

GRIMM, Presiding Judge.

This case involves a suit on an indemnity agreement given to secure a performance bond and a labor and material payment bond, as well as a breach of contract claim. The jury verdicts were (1) for the indemnitors and against the surety on the indemnity claim, and (2) for the contractor and against the surety on the breach of contract claim.

On appeal, surety contends that the trial court erred in giving several instructions, failing to direct verdicts, and excluding evidence. In their cross-appeal, the indemnitors allege that the trial court erred in failing to direct a verdict in their favor on a civil conspiracy count. We reverse and remand the indemnity and breach of contract claims, but affirm the civil conspiracy judgment.

In 1983, a group of investors purchased the S.S. Admiral. That December, Fleischer–Seeger Construction Company (contractor) entered into a contract with S.S. Admiral Partners (owner). This contract provided that contractor was to serve as con-

struction manager in the conversion of the vessel into an entertainment center.

In the contract, the parties acknowledged that the final design, plans, and specifications had not been prepared. Nevertheless, a guaranteed maximum of $15,085,000 was established in the contract, with recognition that if the developed plans indicated that they could not be completed within that amount, the plans would be redesigned. May 1, 1985, was established as "The Date of Substantial Completion."

The contract required contractor to furnish two bonds, each in the amount of $15,085,000. One was a Performance Bond, which in effect guaranteed that contractor's contract with owner would be performed. The other was a Labor and Material Payment Bond; it guaranteed payment of all contracts with contractor for labor and material on the project. As was contractor's custom, these bonds were purchased from Fidelity and Deposit Company of Maryland (F & D).

Each year, contractor furnished F & D with a financial statement of its condition. In addition, in 1976, a continuing Agreement of Indemnity was given to F & D, signed by Alfred J. Fleischer, and his wife, Eva L. Fleischer, as well as Alfred J. Fleischer, Jr., (Fleischers or indemnitors). The three signed as individuals and as co-partners in Fleischer–Seeger Construction Co.

Work began on the Admiral project in 1984. Disagreements arose between contractor and owner. They negotiated from January, 1985, through September, 1985. A work stoppage of approximately six weeks occurred in August–September, 1985. The parties apparently resolved their disputes and on September 30, 1985, "Change Order No. 1, Admiral Contract" was executed.

That change order established February 28, 1986, as a new Date of Substantial Completion. The guaranteed maximum was increased to $16,760,000, with provisions for other possible adjustments not to exceed $525,000. The bonds were required to be increased to this amount, and they were. Other adjustments to the contract, not material to this opinion, were also made.

Peace was short-lived. In the next few months, controversies arose or were resumed. We mention a few. Owner had problems securing adequate financing and contractor was concerned about receiving payment. Numerous requests for change orders and clarifications were submitted by subcontractors; owner claimed contractor did not furnish sufficient documentation to consider the requests, while contractor claimed owner was extremely slow in granting formal approval which delayed payments. Disputes occurred weekly as to adequacy of the contractors staff. Contractor sought a 60–day extension to complete the project, which owner and an arbitrator denied.

### Payment & Work Stoppage Controversies

The contract, as amended by the September 30 change order, required contractor to submit monthly applications for payment. Specifically, paragraph 6.1.1 of the change order required contractor to set "forth the amount requested by item, payee, and budgeted amount, together with copies of bills and contracts trade breakdown in support thereof." Owner was required to pay within 20 days after the documentation was received, "provided the payment is approved by the Architect/Engineer" and lender. The Architect/Engineer was the firm of Helmuth, Obata, and Kassebaum (HOK).

Payment application number 23, for the month of October, 1985, requested $841,875. HOK withheld approval on some items which had been revised, and for which it needed documentation. HOK approved $815,926, which owner paid and contractor accepted.

Payment application number 24, for the month of November, 1985, was submitted on December 9 and asked for $974,962. By letter dated December 16, HOK advised contractor and owner that pages 6 through 16 of the application covered work required due to drawing or specification changes,

but that HOK did not have copies of change orders or written approval/authorization from owner. Lacking the necessary documentation, HOK did not approve any of those items. It approved payment of $780,255 without qualification, and payment of an additional $22,022, if properly qualified.

On January 6, 1986, owner paid contractor $780,255. That same day, contractor delivered written notice to owner and HOK concerning the payment, which was $194,707 less than requested. Contractor advised that, pursuant to paragraph 6.6 of the Change Order, the project would be stopped in seven days unless payment of the balance was received.

On January 8, owner sent contractor a check for $15,734. This check was partial payment of the $22,022 approved by HOK if properly qualified. It was paid under protest, as it allegedly was for salary and wages during the time the project was halted in August, 1985. The other $6,288, representing contractor's legal fees in connection with the September 30 Change Order, was not paid.

On January 13, owner delivered a letter to contractor advising of its intent "to pay for an amount when it becomes due under Paragraph 6.1(ii) of Change Order No. 1." That paragraph provides, "in no event shall a payment be due until it has been approved by the Architect/Engineer and any lender...." Owner insisted that those terms be met.

Also on Monday, January 13, payment application number 25, for the month of December, 1985, was delivered to HOK. The amount requested was $1,404,105; on Friday, January 17, HOK approved $1,139,695 for payment. HOK's letter of approval, received by contractor on Monday, January 20, advised contractor and owner that the application lacked documentation for pages 6 through 16, and therefore it could not approve any of those items for payment.

On Friday, January 17, contractor delivered a written notice to owner; it said: "Pursuant to our letter of January 6, 1986, and the conversations between our respec-

tive attorneys, the Project will be stopped as of 4:30 p.m., on January 17, 1986." Owner responded with a letter that day, insisting that the contract and Change Order be complied with; further it advised that any work stoppage would be considered "to be a material breach of these agreements." Contractor ceased work that day and did not return to the project.

On January 22, owner notified contractor and F & D that the contract was in default. The notice said that contractor failed "to supply enough properly skilled workmen and materials, and has persistently failed and refused to provide or adhere to a Project Completion Schedule" calculated to meet the deadline. A notice was given of intent to terminate if the failures were not cured within seven days. The letter also gave notice that contractor's failures would constitute a breach of the performance bond and that F & D would be requested to complete the contract.

On that same day, following receipt of the letter, Mr. Fleischer, Jr., and F & D's representative discussed the letter. On January 28, representatives of owner, contractor, and F & D met for approximately an hour and discussed the situation.

In the January 28 meeting, contractor gave owner and F & D a six-page letter in response to owner's January 22 notice of default. The letter pointed out that owner had failed to furnish "required data in a timely manner;" and as a result, countless delays had occurred and delays would continue unless corrective action was taken. Lack of access to a computer which owner's agent was to provide also hampered scheduling. Contractor said that it was not in default, but that the problems were caused by owner's agent and owner's nonperformance of its responsibilities.

On February 4, contractor wrote owner that because of owner's "continuing failure to make payment under our contract, we are unable to resume the Project." A week later, February 11, contractor again wrote owner advising that the project "will continue to be stopped until this default is cured."

On February 12, owner advised contractor that due to contractor's failure to cure the violations mentioned in the January 22 notice of default, owner was terminating contractor's employment in accordance with paragraph 13.2.2 of the contract. On that same day, owner demanded that F & D "promptly remedy the default or promptly" complete the contract.

At trial, contractor testified that the "project was delayed because of the inordinate number of changes that occurred on the project, the failure to procure permanent power, and the fact the boat was not enclosed." Contractor estimated that, as of January 17, 1986, it would have taken five additional months to complete the project. The reason for leaving the project on January 17, 1986, was owner's failure to pay for the change orders which had been issued.

### Bonds and Indemnity Agreement

At this point, it is necessary to digress from the chronology of events to briefly examine the bonds given by F & D, and the indemnity agreement given by Fleischers. The performance bond provides:

> Whenever Contractor shall be, and declared by Owner to be in default under the Contract, the Owner having performed Owner's obligations thereunder, [F & D] may promptly remedy the default, or shall promptly
> > (1) Complete the Contract ..., or
> > (2) Obtain a bid or bids for completing the Contract ...

Attached to the performance bond, as well as to the labor and material payment bond, was a "Lender's Dual Obligee Rider" which added Centerre Bank as a named obligee to the bond. In addition, the rider provided that "[t]here shall be no liability on the part of the [contractor] or [F & D] under this bond to the [owner or Centerre] ... unless the [owner] ... shall make payments to the [contractor] ... strictly in accordance with the terms of said Contract as to payments, and shall perform all the other obligations [timely]."

The labor and material payment bond provided that if contractor did not promptly pay claimants "for all labor and material used or reasonably required for use in the performance of the contract," then F & D was obligated to make such payments. A claimant was defined as one having a direct contract with contractor or with a subcontractor of contractor. Suits by claimants could be filed ninety days "after the date on which the last of such claimant's work or labor was done or performed, or materials were furnished by such claimant."

The Agreement of Indemnity which Fleischers gave F & D contains twenty numbered paragraphs; we set out three. In paragraph Second, Fleischers agreed to indemnify F & D from all losses and expenses by reason of F & D executing surety bonds such as those involved here. It continues, saying:

> Payment ... shall be made to [F & D] by the Contractor and Indemnitors as soon as liability exists or is asserted against [F & D], whether or not [F & D] shall have made any payment therefor. Such payment shall be equal to the amount of the reserve set by [F & D]. In the event of any payment by [F & D] the Contractor and Indemnitors further agree that in any accounting between [F & D] and the Contractor, or between [F & D] and the Indemnitors, or either or both of them, [F & D] shall be entitled to charge for any and all disbursements made by it in good faith ... under the belief that it is or was liable for the sums and amounts so disbursed, or that it was necessary or expedient to make such disbursements, whether or not such liability, necessity or expediency existed; and that ... evidence of any such payments made by [F & D] shall be *prima facie* evidence of the fact and amount of the liability to [F & D].

Paragraph Sixth of the agreement concerns takeover of the work bonded. It provides:

> In the event of any breach or default asserted by [owner] in any said Bonds, or the Contractor has abandoned the work on or forfeited any contract ... [F & D] shall have the right ... to take possession of any ... work under any contract

or contracts covered by any said Bonds, and at the expense of the Contractor and Indemnitors to complete [the contract], and the Contractor and Indemnitors shall promptly upon demand pay to [F & D] all losses, and expenses so incurred.

As to the authority of F & D to settle claims, paragraph Thirteenth gave F & D

the right to adjust, settle or compromise any claim, demand, suit or judgment ... unless the Contractor and the Indemnitors shall request [F & D] to litigate such claim ... and shall deposit with [F & D], at the time of such request, cash or collateral satisfactory to [F & D] in kind and amount, to be used in paying any judgment or judgments rendered or that may be rendered, [together with costs, etc.].

### F & D's Involvement

The day after receiving owner's February 12 letter demanding that F & D promptly remedy the default or promptly complete the contract, F & D telephoned Al Fleischer, Jr. The call was followed up the next day by a letter. This follow-up letter said that if the indemnitors wanted F & D to complete the job, such a request should be put in writing. Thereafter, F & D personnel were in contact with Mr. Fleischer, Jr. on almost a daily basis.

On March 4, Mr. Fleischer, Jr. wrote F & D that "[w]hile we deny that [we] ... breached any portion of [the Admiral contract], we recognize the desire to minimize any possible exposure in this matter." He suggested that F & D take over the project and retain contractor to complete the project.

Representatives and attorneys for owner, contractor, and F & D had numerous meetings from late-February through mid-April attempting to reach a settlement. The focus of the negotiations was to work out an agreement to complete the construction, with owner and contractor reserving their rights to litigate their claim that the opposite party breached the contract.[1]

While these discussions were going on, F & D told owner that it was F & D's position that owner breached the contract. Owner, on the other hand, claimed contractor breached. Owner told F & D that if F & D did not "act to cause the boat to be completed, the owner was not going to do it, that the cost would escalate from several, four or five million dollars to probably twenty million or more."

F & D told contractor that it could not be sure that it would win; that owner might be able to prove that contractor breached the contract. That possibility of owner's success exposed contractor and F & D to a substantial risk; the exposure discussed between F & D and contractor was in the area of $30 million if the boat sat there and was not completed.

Negotiations among the three parties broke down in mid-April. As a result, F & D began negotiating with owner to minimize its exposure. F & D notified contractor of this in an April 30 letter. At the same time, F & D requested that contractor and the indemnitors post at least $3,000,000 collateral to cover F & D's exposure. The collateral was not posted. Fleischers took the position that the bonds, and therefore, the indemnity agreement, had been voided by owner's breach.

Contractor told F & D not to pay any of its suppliers or subcontractors. Contractor also instructed F & D not to enter into any settlement agreement with owner. The record is not clear as to the exact time of these communications.

It was contractor's position that the subcontractors had agreed that only funds from owner would be used to pay for labor and materials. This position was based on the language of the subcontracts which said "Contractor shall pay or cause to be paid to the subcontractor ... Dollars ... and only to make payments on account thereof from funds paid by Owner in accordance with the terms of the contract between Contractor and Owner." Since owner had not paid contractor, contractor said it did not yet owe the subcontractors.

---

**1.** At the time of trial, arbitration between contractor and owner was still pending.

On the other hand, F & D took the position that contractor owed the subcontractors, whether owner had paid or not. On May 6, F & D sent Fleischers a letter and a copy of *American Drilling Service Co. v. City of Springfield,* 614 S.W.2d 266 (Mo. App.S.D.1981). F & D's letter expressed the opinion that a "pay when paid" clause is not a condition precedent to payment to the subcontractor; rather, such a clause establishes the time of payment, and payment can only be delayed for a reasonable period of time.

On May 14, owner and F & D reached an agreement. Basically, F & D agreed to pay the subcontractors the amounts due under the architect's certificate of payment of the February, 1986, pay application, less retainage. F & D also agreed to pay the cost of obtaining substitute subcontractors, where necessary, to complete the project. The project was to resume under a construction manager retained by owner. The effective date of the agreement was June 4, and until that date, either party had the unilateral right to terminate the agreement.

The next day, May 15, a copy of the agreement was sent to contractor and each of the indemnitors. Another demand was also made for $3,000,000 collateral to be deposited with F & D. Collateral was not deposited. On June 4, the May 14 agreement went into effect and was performed.

F & D paid $2,602,947.33 under the performance bond to permit completion of the contract. It also paid $2,327,591 to trade subcontractors under the labor and material payment bond. F & D seeks reimbursement of those sums, plus fees and interest.

### F & D's Appeal

■ F & D's primary point is that the trial court erred in giving Instruction No. 9, submitted by contractor as an affirmative converse. It contends that subparagraphs (a) and (c) of that instruction are not correct statements of the law. We agree.

Instruction No. 9, as submitted, states:

Your verdict must be for Fleischers on the Cross–Claim of Fidelity & Deposit Company of Maryland if you believe:

a) The bonds were void as to the Admiral and that the trade contractors were to be paid only from funds supplied by the Admiral, or

b) The payments were not made in good faith, or

c) The Fleischers agreed in the indemnity to reimburse Fidelity only if Fidelity was liable for losses and Fidelity was not liable for losses.

In order to understand why this instruction was erroneous, we first look at some underlying facts and principles.

Under paragraph Second of the Agreement of Indemnity, F & D was entitled to reimbursement from Fleischers "for any and all disbursements made by it in good faith ... under the belief that it is or was liable for the sums and amounts so disbursed, or that it was necessary or expedient to make such disbursements, *whether or not such liability, necessity or expediency existed.*" (Emphasis added). Fleischers's obligation arose "as soon as liability exists or is asserted against [F & D], whether or not [F & D] shall have made any payment therefor."

Such provisions, while strict, are common in indemnity contracts executed by contractors and others to induce the execution of bonds by compensated sureties. *Fidelity and Deposit Co. of Maryland v. Bristol Steel & Iron Works, Inc.,* 722 F.2d 1160, 1163 (4th Cir.1983). *See also Maryland Casualty Co. v. Spitcaufsky,* 352 Mo. 547, 178 S.W.2d 368, 371 (1944). They have been uniformly sustained and upheld. The only exception arises when the payment has been made through fraud or lack of good faith on the part of the surety. *Bristol Steel, supra* at 1163.

Under the Agreement of Indemnity, the burden was not placed on F & D to determine whether owner or contractor first breached the contract. Rather, once owner or the subcontractors made demand on F & D under the bonds, F & D could make good faith disbursements if it believed it was liable, or if it believed disbursement was

necessary or expedient, "whether or not such liability, necessity or expediency existed."

The Agreement of Indemnity did not leave Fleischers without a means to prevent such payments. Paragraph Thirteenth provided that F & D's right to settle claims could be terminated if Fleischers (1) requested F & D to litigate the claims and (2) at the time of the request, deposited collateral with F & D to satisfy any judgments and expenses. Nothing in the record suggests that Fleischers requested F & D to litigate the claims. Further, Fleischers admit that they did not deposit any collateral even after F & D requested that they do so.

Thus, Fleischers opted to not take advantage of these provisions of paragraph Thirteenth. As a result, under the provisions of paragraphs Second and Thirteenth, F & D had the right to settle any claim in good faith whether or not liability, necessity or expediency existed.

*Instruction No. 9(c)*

■ Instruction No. 9, paragraph (c) allowed the jury to return a verdict in favor of Fleischers on F & D's claim if the "Fleischers agreed in the indemnity to reimburse [F & D] only if [F & D] was liable for losses and [F & D] was not liable for losses." The Agreement of Indemnity provided no basis for this submission; its language was to the contrary.

This instruction would permit reimbursement only if F & D "was liable" for the losses. The Agreement of Indemnity between the parties did not so restrict Fleischers's obligations to F & D. As noted, paragraph Second of the indemnity agreement allows F & D to charge Fleischers "for any and all disbursements made by it in good faith ... under the belief ... that it was necessary or expedient to make such disbursements, whether or not such liability, necessity or expediency existed." F & D's right to reimbursement is not dependent upon a determination that it

was, in fact and in law, liable for losses under the bonds.

In *Central Surety & Insurance Corp. v. Hinton*, 233 Mo.App. 1218, 130 S.W.2d 235 (1939), Hinton had signed an indemnity agreement in order to post a bond necessary to do excavation work. The surety settled the underlying case before trial; in that case, the claimant alleged she was injured at the excavation site. The trial court found that there was no negligence on Hinton's part; and thus, the claimant would have lost her case.

The Hinton indemnity agreement contained language similar to that signed by Fleischers. Hinton agreed that the surety was entitled to reimbursement for any amounts "made by it in good faith under the belief that it is or was liable for the sums and amounts so disbursed, or that it was necessary or expedient to make such disbursements, whether such liability, necessity or expediency exists or not." *Id.* 130 S.W.2d at 241.

In *Hinton*, a case now 50 years old, the court commented that "[s]imilar provisions have been before the courts of this country many times." *Id.* The court recognized that the agreement "is very general in its terms and broad enough to cover mistakes of law." *Id.* 130 S.W.2d at 242. As a result, the court concluded that there was "no reason why the agreement should not be construed as applying to a mistake of law made in good faith by the surety in making the disbursement." *Id.*

The *Hinton* court recognized that in the majority of settlements of claims, it is necessary to reach a conclusion as to matters of law involved therein. The court went on to say that "there is no good reason why conclusions upon such questions of law should not be covered by the term 'good faith' as well as conclusions as to purely matters of fact." *Id.* 130 S.W.2d at 243.[2]

Our position is also supported by *Maryland Casualty Co. v. Spitcaufsky*, 352 Mo. 547, 178 S.W.2d 368 (1944), which involved

---

**2.** As all who have drafted either proposed or actual findings of facts and conclusions of law can attest, as to some issues, it is often difficult, if not impossible, to determine what is a finding of fact and what is a conclusion of law.

a suit by a surety company against the indemnitors. The court observed that the surety "was under no necessity to require its liability to be fixed by final judgment" before it acted. "The indemnity agreement authorized [the surety] to make settlement if it deemed itself liable, whether or not such liability in fact existed, and authorized it to make settlement without even notifying [the indemnitors]." *Id.* 178 S.W.2d at 371.

In *Spitcaufsky,* the indemnitors tendered instructions which said that if the surety settled the claims before its liability had become fixed, or knowing facts which would establish no liability, the verdict must be for the indemnitors. *Id.* The court held that the instructions were properly refused, because they "were not based upon the evidence and did not correctly declare the law as applied to the evidence." *Id.* 178 S.W.2d at 372.

Fleischers contend that this court should not follow *Hinton,* rather we should follow *Maryland Casualty Co. v. Zahner,* 190 S.W.2d 996 (Mo.App.E.D.1945). They contend in their brief that "[T]he key factual issue was whether or not [owner] had breached its contract with Fleischer by failing to make required progress payments and by failing to provide final plans and specifications and change order approvals." Their position is that the bonds became void if owner did not strictly perform its obligations. Since owner did not perform its obligations, they contend, F & D had no liability for losses under the bond, and "F & D acted as a 'volunteer' and paid a claim which the 'bonds' did not cover."

*Zahner* is not applicable and does not support the giving of instruction 9(c). In *Zahner,* an assault claim was improperly paid under a larceny and embezzlement bond. Here, the bonds were in favor of this owner for this project, and construction claims were paid under bonds for construction of this specific project. The amounts paid were not "voluntary payments." The giving of instruction 9(c) was prejudicially erroneous; and thus, a new trial is granted.

Since a new trial is granted, we will briefly review some of the other issues raised on appeal which might reoccur at trial.

### Instruction No. 9(a) and (b)

Instruction 9(a) would permit the jury to return a verdict in favor of Fleischers on F & D's claim if "the bonds were void as to [owner] and ... the contractors were to be paid only from funds supplied by [owner]."

In order to determine that "the bonds were void as to [owner]", it would be necessary to litigate whether owner breached the contract with contractor, or whether contractor breached the contract. Such litigation, as between F & D and indemnitors, is not required under the indemnity agreement in order for F & D to seek reimbursement from Fleischers. As noted, absent Fleischers's request to litigate and posting of collateral as provided in paragraph Thirteenth of the Agreement of Indemnity, paragraph Second allows F & D to charge for all disbursements made by it in good faith.

The same rule applies to the instructional clause, "the contractors were to be paid only from funds supplied by [owner]." The submission of paragraph 9(a) was erroneous, and on retrial, paragraph (a) should not be submitted.

As to paragraph (b), it submitted that the "payments were not made in good faith". On retrial, if Fleischers desire to converse F & D's good faith, a true converse instruction based on MAI 33.03 [1980 Revision] would be appropriate. Notes on Use to MAI 33.05 [1980 Revision], however, direct that an affirmative converse instruction should not be used to submit the same issue as has already been submitted in the verdict directing instruction.

### Remaining Issues

#### A. Failure to Direct Verdict

F & D alleges that the trial court erred in not directing a verdict in its favor on its claim because F & D established that it "is entitled to recover for all disbursements made in good faith and good faith was established as a matter of law." We

disagree that good faith was established as a matter of law as to all disbursements.

The Fleischers, however, did not dispute at trial that the subcontractors were owed much of what they claimed as of April 9, 1986, and what F & D thereafter paid them. The Fleischers only claimed that such amounts were not due, because contractor had not been paid by owner. F & D's labor and material payment bond, however, provided that the bond remained in full force and effect if contractor did not promptly pay "for all labor and material used or reasonably required for use in the performance of the contract."

Absent the invocation of Fleischers's rights under paragraph Thirteenth of the Indemnity Agreement, F & D had the right to settle those claims. There was no issue of good faith as to such subcontractors and the uncontested amounts paid to them. It would not have been error for the trial court to have entered a partial summary judgment, based on those amounts, in favor of F & D.

As to other payments, Fleischers contend that they were not made in good faith for various reasons. Whether the other payments were made in good faith is a question for the trier of the fact. *Hinton, supra* 130 S.W.2d at 243.

### B. Exclusion of Good Faith Evidence

F & D also complains that the trial court erred in excluding evidence which formed a basis to establish F & D's good faith. A trial court has considerable discretion in deciding whether to admit or exclude evidence, but it is error to exclude competent evidence on a material issue of fact. *Martin v. Fulton Iron Works Co.,* 640 S.W. 491, 495 (Mo.App.E.D.1982). On retrial, we are confident that the trial court will not exclude properly submitted competent evidence on the issue of good faith.

### C. Fleischers's Verdict Director

Fleischers filed a cross-claim against F & D; three counts—breach of contract, civil conspiracy, and tortious interference with contract—were submitted to the jury. The jury returned a $150,000 verdict for Fleischers on the breach of contract count; F & D received verdicts on the other two counts.

Fleischers's breach of contract count alleged that (1) they paid F & D "to enter into two contracts" with them; the contracts are identified as the performance bond and the labor and material payment bond and the riders thereto; (2) the riders provide that neither Fleischers or F & D have any liability unless owner makes payments to contractor and owner performs all its obligations; (3) two work stoppages occurred because owner had not performed its obligations or made stipulated payments; (4) F & D "violated the terms of the contracts it had with Fleischer ... by setting [sic—settling?] supposed claims against it by [owner] through a settlement agreement;" (5) F & D's claims have prevented contractor from receiving payments due contractor from other unrelated jobs; (6) other insurance companies will not write bonds for contractor because of F & D's claims against them and they have been effectively excluded from the construction business, resulting in the loss of large profits; and (7) contractor has incurred substantial legal fees and its personnel have lost time.

F & D alleges that the trial court committed several errors in giving Fleischers's submitted verdict director for breach of contract. We need not discuss them in detail. As disclosed by Fleischers's pleading, Fleischers's theory was that F & D had breached its contract (the bonds with riders) with indemnitors by settling owner's claims against contractor.

We have previously set forth at length why F & D was authorized, under paragraphs Second and Thirteenth of the Agreement of Indemnity, to settle owner's and subcontractors's claims. Since the Agreement of Indemnity specifically gave F & D authority to settle such claims, there can be no breach of contract for doing that which the indemnity agreement permitted a party to do, providing such settlement did not involve fraud or a lack of good faith on F & D's part.

Thus, if Fleischers are successful in defending F & D's claim for reimbursement, it would be logical and consistent for Fleischers to pursue a breach of contract claim against F & D based on F & D's fraud or lack of good faith. A jury verdict for Fleischers on F & D's claim for reimbursement and a jury verdict for Fleischers on their breach of contract claim against F & D would be consistent and permissible.

If, however, F & D recovers on its claim, the jury, of necessity, would have determined that there was no fraud or lack of good faith on F & D's part. With such a result, it would be illogical and inconsistent for a jury to also award damages to Fleischers on their breach of contract claim, and such a verdict would be impermissible.

Here, on F & D's claim for reimbursement, the jury was misdirected by the giving of instruction 9(a) and (c). Since the new trial is required on F & D's claim for reimbursement, a new trial is mandated on Fleischers's breach of contract claim. Otherwise, it could be argued that a jury, having awarded Fleischers damages on their breach of contract claim, is precluded from considering F & D's claim.

### Fleischers's Cross–Appeal

On Fleischers's civil conspiracy count, as noted above, the jury found in favor of F & D. In their motion for new trial, Fleischer's sole ground was that the verdict was "against the weight of the evidence."

In their cross-appeal, Fleischers now contend that the trial court erred in not granting them a new trial because "Fleischer was entitled to a verdict as a matter of law, based on undisputed facts, once it had been determined that F & D breached its contractual obligations to Fleischer."

█ This cross-appeal is denied. The setting aside of a verdict as against the weight of the evidence is solely within the prerogative of a trial court and is not reviewable on appeal. *Wright v. Martin*, 674 S.W.2d 238, 242 (Mo.App.S.D.1984). Apparently in recognition of this rule, Fleischers framed the point relied on as previously quoted. An appellant, however, may not present on appeal a different point than the one presented to the trial court. *McNabb v. Winkelmann*, 661 S.W.2d 825, 826 (Mo. App.E.D.1983).

### Conclusion

For the reasons previously given, the judgment of the trial court (1) in favor of Fleischers on F & D's cross-claim is reversed and remanded for a new trial; (2) in favor of Fleischers on their breach of contract cross-claim against F & D is reversed and remanded for a new trial; and (3) in favor of F & D on Fleischer's civil conspiracy cross-claim is affirmed.

GARY M. GAERTNER and KAROHL, JJ., concur.