David L. GODAT, Plaintiff/Appellant,

v.

MERCANTILE BANK OF NORTHWEST COUNTY, Defendant/Respondent.

No. 63696.

Missouri Court of Appeals,
Eastern District,
En Banc.

July 5, 1994.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 22, 1994.

Application to Transfer Denied Oct. 25, 1994.

Kenneth Leeds, Preston Roskin, Roskin & Leeds, St. Louis, for appellant.

David Wells, Mike W. Bartolacci, Thompson & Mitchell, St. Louis, for respondent.

SMITH, Judge.

Plaintiff, David Godat, appeals the action of the trial court granting judgment notwithstanding the verdict in favor of defendant, Mercantile Bank of Northwest County (Mercantile). The jury had returned a verdict for plaintiff in the amount of $200,000. The trial court also conditionally granted defendant's motion for new trial on the basis that the verdict was against the weight of the evidence. We affirm.

■ In this case we review the facts and the inferences to be drawn therefrom in the light most favorable to the verdict and the party who prevailed before the jury. *Stark v. American Bakeries Co.*, 647 S.W.2d 119 (Mo. banc 1983) [1]. We set forth the facts within that framework.

Kevin Hasty was a stockbroker with whom Godat transacted business for many years. In the late 1970's Godat invested approximately $70,000 with Hasty. Some of the investments made by Hasty were profitable but many purportedly made were fictitious. Hasty represented to Godat that the investments were profitable and in fact Godat received from Hasty payments of approximately $280,000. At trial Hasty testified that after early 1982 he no longer had any of Godat's money; however he continued to represent to Godat that Godat's investment balance was in excess of $500,000. Hasty furnished documents showing such investment balances and Godat may have paid taxes on the "profits" from these investments.

Early in 1985 Hasty discussed an investment opportunity with Godat. Godat agreed

that he would transfer $200,000 from his investment "account" with Hasty to this new investment. To accomplish this Hasty was to obtain a cashier's check in that amount payable to Godat. On January 12, 1985, Hasty opened an account with Mercantile in the name of Colonial Investors. On January 25, he deposited into that account a check for $221,545 drawn on United Missouri Bank. Contrary to bank policy, the Mercantile teller did not place a hold order on the account. On January 29, Hasty purchased a $200,000 cashier's check from Mercantile payable to Godat. Hasty paid for this cashier's check with a check drawn to cash on the Colonial Investors Mercantile account.

The cashier's check was delivered to Godat that morning. He endorsed it and gave it to a courier service for delivery to Mark Twain Bank. Later that morning United Missouri Bank informed Mercantile it was dishonoring the check Hasty had deposited in the Colonial Investors Mercantile account. Mercantile contacted Godat by phone to advise him that Hasty had insufficient funds to cover his purchase of the cashier's check. Godat called Hasty, who then confessed his misdeeds in an effort to obtain the cashier's check back. Mercantile, which had learned that the check was to be deposited at Mark Twain Bank, notified Mark Twain of its intent to dishonor the cashier's check.

Godat brought this action against Mercantile to recover the face amount of the dishonored cashier's check. The jury returned a verdict in favor of Godat for $200,000. The trial court granted Mercantile's motion for judgment notwithstanding the verdict on the basis that Godat was not a holder in due course because he had not given value for the check, and was therefore subject to any viable defenses of Mercantile. Those, of course, included fraud and theft by Hasty in obtaining the check through his check kiting actions. The trial court alternatively granted Mercantile a new trial because the verdict was against the weight of the evidence.

Godat appealed. His sole point relied on was that the trial court erred in granting defendant's motion for judgment notwithstanding the verdict. No challenge was made to the court's conditional grant of Mercantile's motion for new trial. Division III of this court reversed the grant of judgment notwithstanding the verdict holding that plaintiff was a holder in due course. It also, *sua sponte*, reversed the grant of the motion for new trial on the basis that plaintiff was entitled to a directed verdict as a matter of law. Mercantile's motion for rehearing en banc was granted.

Commercial paper is a critical aspect of the operation of the capitalistic economy in this and other nations. The utilization, issuance, honoring and dishonoring of such documents is the means by which commerce is transacted. Rules concerning commercial paper, uniformly accepted and uniformly applied, have been in place going back to the law merchant of England from which many of our present rules found their origin. Following the previously codified Uniform Sales Act and Uniform Negotiable Instruments Law, the states of this country adopted the Uniform Commercial Code to regulate and codify the use of commercial paper as well as other aspects of commercial enterprise. Missouri has adopted that Code. The transaction here involved occurred in 1985. In 1992 the Uniform Commercial Code was substantially amended in Missouri. We must in this case apply the law as it existed in 1985, although it does not appear that the result would be altered by application of the present Code. Statutory references are to the Code as it existed in 1985.

Much of Godat's argument before us, consistent with his trial position, is premised upon the proposition that cashier's checks differ from other negotiable instruments and that protection of their use in commerce requires that they be impervious to dishonor. Some discussion is therefore warranted of the nature and legal status of cashier's checks. A cashier's check unlike an ordinary check is a check drawn by a bank on itself. The bank is both drawer and drawee. Acceptance of a draft (which includes checks) is the drawee's signed engagement to honor the draft as presented. Sec. 400.3-410. A cashier's check is accepted by the issuing bank by the mere act of its issuance. *State ex rel. Chan Siew Lai v. Powell,* 536 S.W.2d 14 (Mo. banc 1976) [1]. In *Chan Siew Lai* the court

dealt with a situation in which the remitter requested that the bank dishonor its cashier's check because of fraud practiced upon the remitter. The court held that because issuance of the check was acceptance by the issuing bank the provisions of Sec. 400.4–303, dealing with stop-orders, came into play and the bank could not after issuance stop payment. The court stated: "The nature and usage of cashier's checks in the commercial world is such that public policy does not favor a rule that would permit stopping payment of them." [2].

In *Environmental Quality Research, Inc. v. The Boatmen's National Bank of St. Louis,* 775 S.W.2d 199 (Mo.App.1989) this court was faced with a case in which an action was brought by a cashier's check holder against the bank issuing the check for dishonoring it and his own bank for debiting his account after the check was dishonored. The plaintiff subsequently dismissed his action against the issuing bank. Our court was confronted with the issue of whether, in view of the ruling in *Chan Siew Lai, supra,* an issuing bank could dishonor its own cashier's check. In a scholarly opinion by Judge Simon this court concluded that under very limited circumstances a bank could do so. The court distinguished *Chan Siew Lai* on the basis that when a bank issues a cashier's check the check becomes the primary obligation of the bank and the purchaser has no authority to countermand a cashier's check because of fraud allegedly practiced on the purchaser by the payee. Sec. 400.4–303 becomes applicable in that circumstance. We held, however, that statutory provision is for the purpose of settling the relative priorities of conflicting claims to a customer's account and not for the purpose of cutting off a bank's right to assert its own defenses against an instrument issued by it. The section prohibits the purchaser of the cashier's check from stopping payment on it because it is not the purchaser's check; it does not preclude the bank from dishonoring its own check. In making such holding we relied heavily upon *Farmers and Merchants State Bank v. Western Bank,* 841 F.2d 1433 (9th Cir.1987). In *Environmental Quality Research* we also quoted and adopted the following language from *Rezapolvi v. First National Bank of Maryland,* 296 Md. 1, 459 A.2d 183 (1983) [6]:

> "Despite the language in some opinions suggesting that a bank may never dishonor its cashier's check, courts have recognized that a bank may do so under very limited conditions. These are where the holder has dealt with the bank in connection with the transaction or is *not a holder in due course, and where the cashier's check was obtained by fraud upon the bank* or under certain circumstances, where there was no consideration given to the bank for the instrument." (Emphasis supplied).

■ We held that the action of plaintiff's bank in surcharging plaintiff's account for the amount of the dishonored cashier's check did not give rise to a cause of action against that bank. It is clear from *Environmental Quality Research* that in Missouri a bank may under limited conditions dishonor its cashier's check.[1]

■ There can be no question that the cashier's check was obtained by the fraud of Hasty. We then turn to whether the defendant may assert that defense against Godat. Sec. 400.3–306 provides that "Unless he has the rights of a holder in due course any person takes the instrument subject to ... (b) all defenses of any party which would be available in an action on a simple contract; ..." Sec. 400.3–305 provides that "To the extent that a holder is a holder in due course he takes the instrument free from ... (2) all defenses of any party to the instrument with whom the holder has not dealt except [a group of special defenses none of which are applicable here]." These two sections make clear that if plaintiff is a holder in due course

1. Plaintiff has cited us to *Da Silva v. Sanders,* 600 F.Supp. 1008 (D.C.D.C.1984) as authority that cashier's checks cannot be dishonored. We are of course not bound by federal district court decisions. Further it is unclear to us that there was any need for the court to decide whether a bank can dishonor its own cashier's check because the factual statement of the case would appear to indicate that the holder of the instrument against whom the dishonor was sought was in fact a holder in due course. At any rate the conclusion reached by the court is contrary to *Environmental Quality Research* which we choose to follow.

he takes the instrument free from the defenses of fraud or stealing, and as to him the bank may not dishonor the instrument.[2]

Sec. 400.3–302 defines "holder in due course" as "a holder who takes the instrument (a) for value; *and* (b) in good faith; *and* (c) without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person." (Emphasis supplied) The conjunctive "ands" make it clear that the person claiming holder in due course status must meet all three tests. Sec. 400.3–303 addresses the issue of "for value". It provides:

"A holder takes the instrument for value (a) to the extent that the agreed consideration has been performed or that he acquires a security interest in or a lien on the instrument otherwise than by legal process; or

(b) when he takes the instrument in payment of or as security for an antecedent claim against any person whether or not the claim is due; or

(c) when he gives a negotiable instrument for it or makes an irrevocable commitment to a third person."

Plaintiff makes no contention that either (a) or (c) is applicable to his situation. His contention on appeal is that because he believed at the time that he received the check that Hasty owed him money he gave value for the check under (b). We disagree, for such a conclusion eliminates the value requirement by merging it into the good faith requirement. The burden of proof to establish that a person is a holder in due course is upon the person claiming the rights of a holder in due course. Sec. 400.3–307. While there is evidence from which a jury might

have concluded that Godat did not take the instrument in good faith our review requires us to treat that element of plaintiff's proof as established.

At trial the plaintiff tried the case on the theory that Mercantile was under the law not allowed to dishonor the cashier's check under any circumstances. As previously stated, that is not the law in this state. During opening statement plaintiff's attorney made the following admissions:

"There was a payment of ten thousand dollars in December of 1984. Understand, David doesn't know at this point that Kevin Hasty has none of this money. In fact, he hasn't had any of David's money probably for years, and again the question why Hasty's doing this is up in the air."

"It is a bank check, and the evidence will be, ladies and gentlemen, that unless David Godat knew or should have known that this cashier's check was being issued under false pretenses, that even though, and this is the hard part, that even though he technically is not entitled to the money because his brokerage account was basically at a zero balance, unbeknownst to him, as a matter of public policy and because it's the foundation of the banking system, Mercantile Bank should nonetheless be required to honor this check."

"In the end, ladies and gentlemen, and by way of conclusion, this is perhaps the most difficult case for me I've tried because I'm honestly asking you to give somebody something for nothing, in essence, on the basis of an overriding principle, ...."

Plaintiff's testimony included the following admissions made during cross-examination:

---

**2.** It should be noted that the provision concerning a holder in due course relates to the holder against whom dishonor is sought. In his brief and at oral argument plaintiff made arguments that the action of the trial court places the sanctity of cashier's checks in doubt. In support of such arguments plaintiff creates hypothetical situations involving utilization of cashier's checks by persons not holders in due course in transactions where the additional party involved meets holder in due course criteria. Plaintiff posits that the additional party would be taking an instrument subject to attack, i.e. where a party receiving the fraudulently obtained check from

the defrauder as a gift utilizes it to purchase property from a third party. This mistakenly engrafts upon negotiable instrument law concepts from real property law wherein a defect in the chain of title casts a cloud upon subsequent ownership. Real property is subject to recording requirements while negotiable instruments are not. Therefore defects in the chain of title are treated differently. The status of a holder of a negotiable instrument is determined by the circumstances under which he took the instrument. A holder in due course takes free from defenses regardless of the status of his predecessor holders.

"Q. And in fact, as of January 1, 1985 Mr. Hasty owed you no money?

A. No, I don't know that.

Q. You don't know that?

A. As of January 1 and the check was issued January 29.

Q. Yes?

A. On January 1 I thought he owed me the money.

Q. I'm not asking you what you believed then. I'm asking you to tell the jury what we know now?

A. We know that now.

Q. All of us know, in truth and in fact, Mr. Hasty owed you no money at the time the cashier's check was issued?

A. That's correct.

Q. And you would agree, would you not, that as of January 29, 1985, Colonial Investors owed you no money?

A. That's correct.

Q. And you would agree that none of the brokerage houses with which Mr. Hasty had been associated through years owed you money as of January 29, 1985?

A. That's correct."

"Q. Did you or did you not know what we know today did you on (sic) or did you not give anything of value for the two hundred thousand dollar cashier's check?

A. It's a loaded question. I invested seventy thousand dollars with him originally and he turned that around to a lot of money. Yes, I think I did.

Q. You're telling this jury as of January 29, 1985, Mr. Hasty owed you money?

A. I believe that. Yes, I do.

Q. You believe that today?

A. Not today I don't, but then I did.

Q. I'm talking about today sir December, 1992. Are you testifying, are you telling this jury that as of the day that the cashier's check was issued Mr. Hasty owed you any money at all?

A. After the date the check was issued?

Q. What you know today.

A. No, not now.

Q. He didn't?

A. Right.

Q. Would you agree, sir, knowing what you know today, that you gave nothing of value for the cashier's check?

A. That's correct."

In *Blue Cross Health Service, Inc. v. Sauer,* 800 S.W.2d 72 (Mo.App.1990) [21] we stated that "One can only take 'for value' by giving in return something 'of value' to the one from whom the instrument is taken." "Good faith" is in large part a subjective test but "for value" is objective. Plaintiff's position essentially eliminates the objective "for value" requirement by substituting therefore a subjective belief that value is being given. The premise of the "holder in due course" doctrine is to protect those persons who part with something of value in reliance on the negotiability of a check or other instrument. Persons who give up nothing of value do not need the protection of the doctrine because they put nothing at risk and give up nothing. That is plaintiff's situation here. He gave nothing of value for the cashier's check, he was not a holder in due course, and the bank may assert any defenses it has, including fraud and theft, which were undisputed.

 Plaintiff also contends that Mercantile was negligent in issuing the cashier's check and should therefore bear the loss. What loss is not identified. Conceding that the bank was negligent in failing to follow its own procedures that does not entitle plaintiff to a $200,000 windfall. Negligence is not a defense to unjust enrichment where the person receiving the unjust enrichment is not legally harmed by the negligence. *Blue Cross Health Services, Inc. v. Sauer, supra,* [5–7]. The issuance of the check in no way injured or damaged plaintiff.

Judgment affirmed.

CARL R. GAERTNER, GRIMM, CRANE, AHRENS, and CRAHAN, JJ., concur.

REINHARD, J., concurs in result of opinion of SMITH, J.

KAROHL, J., dissents with opinion.

GARY M. GAERTNER, C.J., and PUDLOWSKI, SIMON and CRANDALL, JJ., dissent and concur in opinion of KAROHL, J.

CRIST, J., not participating.

KAROHL, Judge, dissenting.

I must dissent.

Mercantile Bank dishonored its cashier's check made payable to David Godat, an innocent payee. The remitter of the cashier's check was Godat's dishonest investment broker. Without Godat's knowledge, Kevin Hasty purchased the cashier's check utilizing a fraudulent check scheme and the bank negligently failed to confirm the sufficiency of the remitter's funds. Godat received, endorsed and delivered the check to another before he learned of Hasty's wrongdoing.

The parties tried the case on the assumption Godat must be a holder in due course to recover. The elements necessary to establish Godat's status as a holder in due course were the basis of the verdict directing instruction. The evidence in the present case supported the verdict and would support a finding Godat was a holder in due course of the cashier's check. Therefore, it is unnecessary to decide, as the majority does, whether Godat was entitled to recover only if he was a holder in due course of the cashier's check.

In general, upon proof of an available defense against payment of a negotiable instrument, a person entitled to enforce the instrument bears the burden of proving his or her status as a holder in due course. Section 400.3–307(b)(3) RSMo1978 (Now § 400.3–308(b) RSMo Cum.Supp.1992). It is not clear that this requirement applies to the holder of a cashier's check. See, e.g., § 400.3–412 RSMo Cum.Supp.1992 and Da Silva v. Sanders, 600 F.Supp. 1008 (D.C. 1984). Section 400.3–412 was added and adopted in Missouri in 1992 to the Uniform Commercial Code in order to define the obligation of the issuer of a note or a cashier's check. The majority concludes "it does not appear that the result would be altered by application of the present Code," but it fails to examine this section. Significantly, § 400.3–412 defines the obligation of the issuer "at the time it was issued," or "if not

issued, at the time it first came into possession of a holder." The new section does not distinguish a holder from a holder in due course for purposes of defining the bank's obligation. The commentary for the new section concludes it did not change existing law. However, the parties in the present case did not contest the issue of the integrity of a cashier's check in the hands of a holder. Therefore, it is only necessary to examine whether the jury verdict was supported by the evidence.

The jury found under the non-MAI verdict directing instruction that: (1) Godat was a holder of the cashier's check; (2) he took it for value; (3) he took it in good faith; (4) he took it without notice it was obtained without consideration; (5) it was not paid; and, (6) the bank's refusal to honor the cashier's check caused damage.

The trial court granted Mercantile's motion for judgment notwithstanding the verdict because it found:

The evidence at trial was uncontroverted that Plaintiff did not pay value for the cashier's check as defined in § 400.3–303 RSMo. Plaintiff admitted that, at the time he received the check from Kevin Hasty, Plaintiff had no money invested with Hasty and Hasty owed Plaintiff no money.... Given that Plaintiff did not pay value for the cashier's check, he was not, as a matter of law, a holder in due course as defined in § 400.3–302 RSMo.

The uncontroverted evidence also established that the cashier's check was procured from Defendant by fraud, that Kevin Hasty provided no consideration for the check, that Plaintiff did not take the instrument in good faith, and that he had notice from the bank, before he presented the check, that the check had been fraudulently procured. Finally, there was no evidence that Plaintiff was in any way damaged.

These findings are wholly unsupported by the evidence, and immaterial insofar as they relate to information known at the time Mercantile dishonored its cashier's check or at the time of trial, rather than at the time Godat came into possession of it. After dis-

honor the holder of the check at the time of dishonor returned the check to Godat as its endorser. These facts illustrate the legal problem created by casting doubt on the commercial use of a cashier's check.

The only relevant facts are: (1) Godat received the cashier's check, endorsed it and delivered it to a third party to purchase an interest in a new investment; (2) at that time he knew nothing about the circumstances under which the check was issued; (3) at that time he knew only that Kevin Hasty, the remitter of the check, owed him far more than the amount of the check; and, (4) his investment account balance with Hasty was proven by his testimony and statements of that account which were exhibits in evidence. After Hasty defrauded the bank he changed his story and denied there was an investment balance. *If* it is relevant that Godat gave value for the check, he did by crediting Hasty with the amount of the check against his account balance. The jury verdict was therefore fully supported by the evidence when viewed in the light most favorable to the verdict. Neither the trial court nor this court has authority to question the verdict for Godat by directing a verdict for Mercantile Bank. *Stark v. American Bakeries Co.*, 647 S.W.2d 119, 121 (Mo. banc 1983).

Godat was indisputably the holder of the cashier's check in question. He was in possession of the instrument, issued to him, with an apparent right to enforce it. He received it in good faith and without notice of Hasty's check kiting scheme. The instrument was regular on its face. Both Godat and Hasty, a witness on behalf of Mercantile, testified Godat was told and believed Hasty was turning over $200,000 of Godat's own money. Hasty testified Godat was unaware of any of Hasty's illegal activity or that the name "Colonial Investors" and the investment statements he gave Godat were fictitious, at the time Godat received the cashier's check. Hasty's account with Mercantile was in the name Colonial Investors. Godat learned of Hasty's fraud *after* he received and endorsed the cashier's check and after he used the check to purchase an investment in 24–Hour Postal Center, Inc.

The evidence of "value" which supported the verdict consisted of (1) investment statements dated after July 1983 evidencing in excess of $500,000 in transactions, and, (2) Hasty's testimony that he continued to represent to Godat, up to and including the moment the cashier's check was delivered to Godat, that Godat's account balance exceeded $500,000. Godat believed his investment accounts were worth well in excess of $200,000 up to and including the moment of delivery and endorsement of the cashier's check, and the check consisted of Godat's own funds. The value Godat gave for the check was a credit; Hasty owed Godat $200,000 less immediately after delivering the instrument to him. Section 400.3–303(b) RSMo1978. The jury could properly believe this evidence and disregard or disbelieve Hasty's testimony that there was no account balance. *DeWitt v. American Family Mutual Ins. Co.*, 667 S.W.2d 700, 709 (Mo. banc 1984). A jury can believe one part of a [witness'] testimony and reject another. *Id.*

The trial court apparently found that because Hasty subsequently claimed and Godat concluded Hasty had no more of Godat's money, the transfer of the cashier's check from Hasty to Godat did not in fact discharge any obligation Hasty owed to Godat. On these facts, it found there was no exchange of value and a failure to honor the check caused no damage. However, the fact that Godat came to believe Hasty was no longer in possession of money in an account earmarked for Godat does not change the fact that Godat's testimony and the investment statements entered in evidence showed transactions involving a balance of over $500,000 owed to Godat. The legal rights of Godat, as a holder in due course, and duties of Mercantile, as issuer of a cashier's check, were settled as of the time the check was delivered. The jury could have surmised from the investment statements that Hasty in fact did owe Godat at least $200,000 at the time the cashier's check was issued and delivered rather than believing Hasty's story that he kept gratuitously giving Godat his own money or money obtained from other sources. Hasty had no apparent motive to lie to Godat before the fact. He had a strong motive to lie after the fact. Hasty's motive when he

told Godat there was no account balance was to get the check back for return to the bank. Godat's concession at trial that Hasty did not have $200,000 of his money depended on the validity of Hasty's remarks made after the bank discovered the fraud. It was not a matter Godat could determine independent of Hasty. Godat's belief at the time of trial was not proof he did not have an account balance to credit. He did not vouch for Hasty's credibility.

Hasty's fraud upon Mercantile does not affect Godat's status as holder in due course, as long as he was unaware of it. Both Hasty and Godat testified Godat had no knowledge of any wrongdoing in the acquisition of the cashier's check, and he took it in good faith. Hasty's statement that he no longer owed Godat anything, yet was willing to give him a $200,000 cashier's check, was for the jury to believe or disbelieve.

The fact that Godat previously received a sizable return on his investment does not exclude the possibility that over a period of years he earned and was entitled to that amount or more and also have an account balance. A conclusion that Godat was not damaged constitutes a judicial determination that Godat received an appropriate or adequate return on his original investment before receipt of the cashier's check and that Hasty's revised version of the facts was true. The jury found the reverse.

A cashier's check, unlike an ordinary check, is a check drawn by the bank on itself. A cashier's check is accepted by the mere act of its issuance, and it becomes the primary obligation of the bank to pay from its own assets upon demand. *State ex rel. Chan Siew Lai v. Powell*, 536 S.W.2d 14, 16 (Mo. banc 1976). The nature and usage of cashier's checks in the commercial world is such that public policy does not favor a rule that would permit stopping payment of them, as they circulate in the commercial world as the equivalent of cash. *Id.* People accept a cashier's check as a substitute for cash because the bank stands behind it, rather than an individual. *Id.*

The majority relies on dicta from *Environmental Quality Research, Inc. v. Boatmen's Nat'l Bank of St. Louis*, 775 S.W.2d 199, 204–205 (Mo.App.1989), (citing *Rezapolvi v. First Nat'l Bank of Maryland*, 296 Md. 1, 459 A.2d 183, 188–189 (Md.1983)), in holding that a bank may effectively dishonor its cashier's check, if it was obtained through fraud, and if it is not in the hands of a holder in due course. We did not reach that broad conclusion in *Environmental Quality Research*, a case in which the bank issuing the subject cashier's check was no longer involved when the case was tried. In *Environmental Quality Research*, we held the deposit of a cashier's check into a payee's account was provisional rather than final because the deposit was for collection. *Id.* at 205. For that reason the payee's bank did not act improperly in debiting his account when the cashier's check was dishonored. The obligation of the issuing bank to the payee was not an issue after plaintiff dismissed its claim against the issuing bank without prejudice.

The majority also misplaces reliance on *Blue Cross Health Services, Inc. v. Sauer*, 800 S.W.2d 72 (Mo.App.1990), wherein we held checks mistakenly mailed to the wrong payee with the same first and last name, which were used to pay antecedent debt of some person but not the intended person, were not given for value for purposes of holder in due course status. The "value" which renders the possessor of the instrument a holder thereof must have some meaning to the maker or transferor of the instrument. *Id.* at 77. The check in the present case had meaning for Godat in that it was partial payment of a debt owed to him. He was the true payee of the check.

An alternative grant of a new trial based on the trial court's assessment the jury's verdict is against the weight of the evidence is not reviewable on appeal, *Witt v. Austin*, 806 S.W.2d 63, 65–66 (Mo.App.1991), *Fidelity & Deposit Co. of Maryland v. Fleischer*, 772 S.W.2d 809, 819 (Mo.App.1989), unless this characteristically discretionary order is based on a misapplication of law. *State ex rel. State Highway Comm'n v. Nickerson and Nickerson*, 494 S.W.2d 344, 346 (Mo. 1973). This case is controlled by the exception.

Rule 78.03 requires a trial court ordering a new trial to specify the grounds on which it is granted. Here, the trial court followed its JNOV findings with the alternative finding that the "jury's verdict is against the weight of the evidence." There were no additional findings, other than those already quoted concerning the JNOV findings. This grant of a new trial was based on a finding that Hasty's fraud upon the bank affected Godat's right to enforce the cashier's check, and a finding that good faith, value, and damages were to be measured at the time of trial rather than upon the issuance and delivery of the cashier's check. These findings are all misapplications of the law and the alternative grant of a new trial is erroneous as a matter of law. On the facts, there was no evidence to be weighed except the opposing testimony of a single witness, Hasty.

I would reverse the judgment notwithstanding the verdict and remand for the trial court to enter judgment on the jury verdict in accordance with this opinion.